## Case No. 17,891.

### WINTER v. LUDLOW.

[16 Leg. Int. 332, 340, 348; [1] 3 Phila. 464.]

Circuit Court, E. D. Pennsylvania. Oct., 1859.

EQUITY JURISDICTION — NONJOINDER OF PARTY — SUPPLEMENTAL BILL—SUBPŒNA—SERVICE IN DIFFERENT DISTRICT.

1. The act of congress of 28th February, 1839 [5 Stat. 321], does not enable the circuit courts of the United States to make a decree in equity which may affect a resulting interest in the subject of controversy vested in a party not before the court.

2. Where an objection for the want of such a party has been sustained at a final hearing, the court, instead of dismissing the bill, usually retains the cause, in order that he may be made a party.

3. Where a person is a necessary party, in consequence of an act performed by himself after the commencement of the suit, the proper proceeding to bring him into court, is an original bill, in the nature of a supplemental bill.

4. Such a proceeding, though supplemental as to the former parties, is original as to the new party; and, though the former suit was commenced before the passing of the act of 4th May, 1858 [11 Stat. 272], may, if afterwards instituted, be within the meaning of that law, a suit brought after its enactment.

5. Under that act, and under the previous law and practice of the circuit courts in equity, a subpœna issued in such a case out of the circuit court, for either of two districts of a state, may be served in the other district of the same state.

In equity. After a final hearing, the decision of this cause was prevented by an objection that a decree could not be made until a person of the name of S. B. Ludlow should have been brought into court as a party. The question afterwards arose whether a subpœna issued by this court against this person, who was a resident of the Western district of the state, could be served upon him in that district. Upon the questions whether he was a necessary party, and whether he could thus be served with process, the opinion of the court was as follows:

CADWALADER, District Judge. S. B. Ludlow is not a person against whom, as a party, an enforcement of any decree by judicial process would be necessary. The question whether he was a necessary party, depended, therefore, upon the species of necessity which is determinable with a sole reference to the right of contestation recognized by courts of equity as belonging to every person who has an interest in the subject of controversy. The act of 28th February, 1839, provides that where, in any suit at law, or in equity, commenced in any court of the United States, there shall be several defendants, any one or more of whom shall not be inhabitants of, or found within, the district where the suit is brought, or shall not voluntarily appear thereto, it shall be

[1] [Reprinted from 16 Leg. Int. 332, 340, 348, by permission.]

lawful for the court to entertain jurisdiction, and proceed to the trial and adjudication of such suit between the parties who may be properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties not regularly served with process, or not voluntarily appearing to answer; and the nonjoinder of parties who are not so inhabitants, or found within the district, shall constitute, no matter of abatement, or other objection to said suit. Under this act, a decree might have been made, without S. B. Ludlow as a party, so far as the amounts for which the original defendants were pecuniarily liable to the draftholders were concerned. But such a decree, if these defendants were still insolvent, might have been of little avail to the complainants. The question principally considered, therefore, has been whether under the act, or independently of it, the objection could be disregarded as to the fund in the hands of the receiver. Of this fund the resulting ownership is in S. B. Ludlow, who, if the complainants' case were fully sustained, has an option to redeem the fund by payment of the drafts in question from other sources. Independently of this right, he has an interest entitling him to contest every allegation of the bill on which a decree in favor of the draftholders might be founded, and to avoid, if he can, the effect of the complainants' allegations, by introducing new matter. The act of 1839 does not sanction a decree that may affect such an interest unless its proprietor is before the court as a party. Shields v. Barrow, 17 How. [58 U. S.] 130, Coiron v. Millaudon, 19 How. [60 U. S.] 115, and Green v. Sisson [Case No. 5,768], show that the present case, as to the fund in the receiver's hands, must, therefore, be determined independently of that act.

In the circuit courts of the United States, in consequence of "the peculiar structure of their limited jurisdiction over persons," the general rule of equity practice, that all persons interested shall be brought in as parties, has not been applied without some qualification. Its unqualified application, in cases not within the act of 1839, would often divest these courts of their jurisdiction as it is defined in the constitution and acts of congress. Therefore, if a plaintiff has done all that lies in his power to bring every person interested before the court, a decree upon the merits may be made, though an interest exists in some person whom, as the resident of another state, the process of the court cannot reach, if the case may be completely decided as between the parties in court. But this relaxation of the rule has been admitted only where "the right of the party before the court did not depend upon the right of the party not before the court; each of their rights stood upon its own independent basis; and the ground upon which it was necessary, according to the general principle, to have both before the court, was,

to avoid multiplicity of suits, and to have the whole matter settled at once." No exception from the rule has ever been allowed where the rights of the parties before the court, are not separable from, and independent of, the rights of the person who is not made a party. In such a case there can be no adjudication affecting the subject. This appears from the case of Mallow v. Hinde, 12 Wheat. [25 U. S.] 197–199, cited in Shields v. Barrow [supra], and in other decisions which might be mentioned.

According to these rules of decision, the objection of the want of S. B. Ludlow as a party prevented a decree from being entered in favor of the complainants. For any reason other than to facilitate an appeal from a decision in support of this objection, the court was not willing to dismiss the bill hastily upon the objection. As between the complainants and the original defendants, this fund had been rightly taken into the custody of the court for the purpose of preventing its malappropriation. There was no want of jurisdiction between these original parties; and at the stage of the cause at which the receiver was appointed, the objection of the want of other necessary parties would not have prevented his appointment. See [Mallow v. Hinde] 12 Wheat. [25 U. S.] 198; 2 Russ. 149, 152; 3 Hare, 62, 63. It might then have been expected that S. B. Ludlow, when apprised of the proceeding, would become a co-plaintiff. If, in an ulterior stage of the proceeding, the court found itself unable, without having him before it as a party, to make a decree upon the merits, the suggestion of the difficulty was by parties who did not support the objection upon any equity of their own. Whether a decree of dismissal could have been made at the instance of these defendants, without some provision for the future security of the fund in court, is a question which it was not necessary immediately to decide. The fund could not be restored to them, to be handed by them to Beebee & Company, under the wrongful acts of appropriation which have been mentioned, without permitting a palpable violation of honesty. Certainly, no decree, other than one in favor of the draft holders, would have been proper while there was any probability that, if the cause were retained, the impediment in the way of such a decree on the merits might be removed. In the above cited case of Mallow v. Hinde, an injunction against proceeding under judgments at law had been granted in an early stage of a suit in equity, in which the objection of want of parties finally prevailed. The necessary parties who could not be served with process were named Taylor and the Beards. The supreme court said: "We have no doubt the circuit court had jurisdiction between the complainants and the defendant Hinde, so far as to entertain the bill, and grant an injunction against the judgments

at law, until the matter could be heard in equity. And if it had been shown to the circuit court, that from the incapacity of that court to bring all the necessary parties before it, that court could not decide finally the rights in contest, the court, in the exercise of a sound discretion, might have retained the cause, and the injunction, on the application of the complainants, until they had reasonable time to litigate the matters of controversy between them and Taylor and the Beards in the courts of the state, or such other courts as had jurisdiction over them; and if then it was made to appear, by the judgment of a competent tribunal, that complainants were equally interested with the rights of Taylor, the trustee, and the cestuis que trust, * * * the circuit court could have proceeded to decree upon the merits. * * * Such a proceeding would seem to be justified by the urgent necessity of the case, in order to prevent a failure of justice." [Mallow v. Hinde] 12 Wheat. [25 U. S.] 198, 199.

The court suggested its readiness to dismiss the bill without prejudice, founding the dismissal upon the want of S. B. Ludlow as a party, if such a dismissal would expedite an appeal from such a decision of the point. But the complainants' counsel intimated no desire of an immediate decision for this purpose. The cause was retained, therefore, with a suggestion, however, from the court, that perhaps it could not be thus retained indefinitely. The practice in England, as Mr. Daniel states it on the authority of 2 Atk. 14, 3 Atk. 111, and 5 Brown, Parl. Cas. 504, is, not to dismiss a bill for want of parties immediately, when the objection is sustained, but to order the case thus to stand over. In Herndon v. Ridgway, 17 How. [58 U. S.] 425, a cause appears to have been retained twelve months before dismissal for want of parties upon motion in an earlier stage of the proceedings.

At this period the belief was that S. B. Ludlow, as a citizen of California and resident of that state, was not amenable to the process of the court. He had, however, as the complainants allege to have been afterwards ascertained by them, become, in the meantime, a citizen of Pennsylvania, by having resumed his residence in the state, but in the western district. The complainants have since adopted measures for making him a party. An objection to the sufficiency of these measures for their intended purpose has been interposed. It is made, not on his own part, but on that of the original defendants. Nevertheless, it must be considered, so far as it involves the question whether he has been effectually made a party in the cause.

The complainants appear to have assumed that, as to S. B. Ludlow, the necessary proceeding is for the simple addition of a party by way of amendment. This is a mistake. The foundation of the right of suit in this

case is the appropriation made on the 1st September, 1851, by the original defendants. But S. B. Ludlow had, as we have seen, a right of ratifying this act so as to make it his own. His letter of 14th October, 1851, which appears to have been his first adoption of it, was not written until after the original bill in this case had been filed. If this letter had not operated as a ratification, it would have constituted in itself a sufficient independent appropriation for the security of some, if not of all of the draftholders. Regarded as a ratification, its effect was to modify materially the character of the interest which had previously been equitably vested in the draft holders under the appropriation, as an act of the original defendants alone. Until thus ratified, it had taken effect only as the declaration of a trust attaching to these defendants' own interest in the ultimate proceeds of the remittances in their hands. It operated afterwards as an assignment of the immediate property in the remittances themselves upon a direct trust for the security of the draft holders. Even if the necessity for the proceeding against S. B. Ludlow had not, in part, arisen thus from a material occurrence happening after the filing of the original bill, he could not regularly have been brought in as a party by way of simple amendment in so late a stage of the cause. When a cause, after evidence taken or a master's report made, has been heard upon a bill, answer and replication, a new party who might, in an earlier stage, have been added by amendment, cannot regularly be brought in otherwise than by supplemental bill. But, a bill simply supplemental, or a supplemental bill in the nature of an amended bill, is a proceeding essentially different from that which must be instituted where parties have acquired, as the complainants had here acquired, a new or modified equitable or legal interest in the subject of litigation after the commencement of the original suit, or where the relation of defendants to the subject of controversy may be determinable, in part, by the effect of an occurrence happening—or as in this case, an act performed—since its commencement. Such a new proceeding may, according to the circumstances of different cases, approximate, in its character, in various degrees, to that of an original bill; and so far as a new party is concerned, may, sometimes even become a bill entirely original. In 1 Eq. Cas. Abr. 2 (B) pl. 1, reasons are given for the rule, which was recognized nearly two centuries ago, that a devisee cannot bring a bill of revivor, for want of privity, but must bring his original bill. When a new party is to be added in respect of such an interest as was in question in the present case, and the effect of the proceeding against him depends, or may depend, upon the effect of an act which, like S. B. Ludlow's ratification

of the paper in question, has occurred after the former suit was brought, the bill, though supplemental, as to the former parties, is, as to him, an entirely original bill. This is distinctly apparent in Vice Chancellor Shadwell's opinion in Woods v. Woods, 10 Sim. 210, 213, a case which, much less than the present, required such a decision. He founded his opinion upon texts of Lord Redesdale's treatise which he quoted. The following additional passages may be cited from the 4th edition of the treatise. On pages 72, 73, 98, and 99, Lord Redesdale specifies cases in which "the suit cannot be continued by a bill of revivor, and its defects cannot be supplied by a supplemental bill; but by an original bill in the nature of a supplemental bill the benefit of the former proceedings may be obtained." He says (page 99): "This bill, though partaking of the nature of a supplemental bill, is not an addition to the original bill, but another original bill, which, in its consequences, may draw to itself the advantage of the proceedings on the former bill." He had on pages 63 and 64 defined cases in which parties to the suit are able to proceed in it to a certain extent, though, from an event subsequent to the filing of the original bill, the proceedings are not sufficient to attain their full object, as when the subsequent event gives a new interest in the matter in dispute to any person not a party to the former bill, or a new interest to a party. He observed, in effect, that in such cases, the defect may be supplied by a bill which is usually called a supplemental bill, and is, in fact, merely so, with respect to the rest of the suit, though with respect to its immediate object, and especially against any new party, it has also, in some degree, the effect of an original bill. He says on pages 72 and 73: "There seems to be this difference between an original bill in the nature of a bill of revivor, and an original bill in the nature of a supplemental bill. Upon the first, the benefit of the former proceedings is absolutely obtained, so that the pleadings in the first cause, and the depositions of witnesses, if any have been taken, may be used in the same manner as if filed or taken in the second cause; and if any decree has been made in the first cause, the same decree shall be made in the second. But in the other case, a new defence may be made; the pleadings and depositions cannot be used in the same manner as if filed, or taken, in the same cause; and the decree, if any has been obtained, is not otherwise of advantage than as it may be an inducement to the court to make a similar decree." This passage was commented upon by Lord Eldon, 9 Ves. 54, 55, in the case of a tenant in tail, who, upon the death of a preceding tenant in tail party to a suit in equity, succeeded to the right of suit, not as heir of the former party, but as remainderman, "claiming," as Lord Eldon expressed it, "by

force of a new limitation, and not by succession." He thought the right of such a party to the benefit of the former proceedings, including the depositions, dependent upon such order as the court might make upon a view of the circumstances of the case. See, also, 13 Sim. 287, 288; 2 Hare, 95, 96. In the case in 10 Sim. from which Vice Chancellor Shadwell's opinion has been quoted, a bill was filed against a trustee with power to sell, and a purchaser from the trustee, to set aside the purchase on the ground of fraud. The purchaser, after filing his answer, died. The plaintiff then filed against his devisees the bill which Sir Lancelot Shadwell denominated original as to them, though supplemental as to the trustee. The question was, whether the insertion by the pleader, in the latter bill, of nearly the whole of the contents of the original bill, was, or was not, according to the rules of equity practice, objectionable. It would have been objectionable, if the proceeding in question had been, as to the new parties, a continuance of the original proceeding. The vice chancellor decided that it was not objectionable, because the suit, as to them, was an entirely new one. It was, he thought, not less a suit newly brought as to them because the former proceeding was continued against the original parties. In our practice, a supplemental bill which, as to a new party, is an original bill, would no doubt be sustained if references to the contents of the original bill on file were so made as to incorporate the parts referred to, without repeating them at length. In the case which has been cited, the decision was, not that they "must," but that they "might" be thus repeated.[2] The omission to repeat them would not render the substantial character of the proceeding less that of a suit newly brought against such a party.

The case thus decided was not one in which the point arose, as it here arises, upon an act of the new defendant himself, performed after the commencement of the original suit. The present case is, therefore, even more clearly, that of a new suit against S. B. Ludlow, in respect of his act of ratification, than the case decided by Vice Chancellor Shadwell. The proper character and form, in this respect, of a proceeding for the purpose of bringing in S. B. Ludlow as a party, having been thus determined, we may, before considering further the sufficiency of the particular measures which have been adopted for the purpose, inquire whether the process of the circuit court for this district of the state, can, in any mode, be executed for the purpose, in the other district.

The compulsory exercise of the jurisdiction of the courts of the United States, through the execution of process by the marshals of

the respective districts, may, where a state has been divided into two or more districts, depend upon the division of the state in which a party resides, or may be served with process. The marshal, where his authority has not been, for special purposes, enlarged by particular legislation, can "execute throughout the district" for which he has been appointed, all such lawful precepts issued under the authority of the United States as may be directed to him; but cannot go out of his district. The occasional consequent limitation of the exercise of the jurisdiction of the circuit courts is, however, not a limitation of the jurisdiction itself. This jurisdiction of the circuit courts never depends upon the district of a state in which one of her citizens resides or may be found. The jurisdiction, as to all persons, except aliens, depends upon citizenship alone of the respective states. In the present case, therefore, the question is not of jurisdiction, but of its exercise. See [Gracie v. Palmer] 8 Wheat. [21 U. S.] 699; Harrison v. Rowan [Case No. 6,140].

Under acts of congress now in force, there are states of which each constitutes a single judicial district. The other states are divided, each into two or more districts. No state is divided into districts which are in different circuits; and no district is composed of parts of any two states. Under the judicial system of the United States, the relations, within a state, of two districts into which it has been divided, are, for many purposes, different from the relations of either or both to the district of any other state. The differences depend as well upon considerations of uniformity in the exercise of jurisdiction, as upon those of the separate sovereignties of the several states, which require, for the one case, provisions not needed for the other. For some purposes, the several districts of a state are little else than divisions of a district composed of the entire state.

The general motives and purposes of the series of statutes which have organized the system, and regulated the course of procedure under it, have been consistent and uniform. The act of 13th February, 1801 [2 Stat. 89], by which the courts were temporarily re-organized, should not, however, be regarded as one of the series. If a deviation, or tendency to deviate, in some particulars, from their otherwise uniform policy may be detected in certain provisions of this act, the extreme shortness of the time during which it was permitted to remain in force, and the complete restoration of the previous system effected by its early repeal, furnish sufficient reasons to dismiss it from consideration under this head, and render any recurrence to the well known historical causes of its repeal unnecessary. The judiciary act of 1789 [1 Stat. 73], contained peculiar provisions as to Kentucky and Maine. The provisions have ceased to be in force; but their

---

[2] Since the decision the practice in England has been modified by statute and by orders in chancery.

former motives require explanation. Kentucky, though a part of Virginia, was, under the provision in the constitution for the admission of new states, on the very point of becoming a separate state. As to her, the legislation was for her prospective condition of a state. Maine, though a part of Massachusetts, was territorially detached. So far as the course of procedure might be concerned, she was to be treated as a separate jurisdiction, in order that crossing and recrossing the intervening state of New Hampshire, in the service of process, might be avoided. This act made Kentucky and Maine each a separate district. Neither of these two districts was made a part of any judicial circuit. The act conferred the jurisdiction of a circuit court upon the district court of each of them, so far as this could be done without making it a circuit court. Eleven other judicial districts, created by the act, were composed, each, of one of the eleven states which had then ratified the constitution. These eleven states, as districts, were divided into three circuits, each composed of two or more such states as districts. The two other original states having afterwards ratified the constitution, each of them was, in the year 1790, made a district, and annexed to one of the three former circuits. In 1792, under an act passed in 1791 [Id. 189] Kentucky was admitted as a state, without any immediate change in the provisions, concerning her, of the act of 1789. Vermont, having also become a state, was, in 1791, made a district, and annexed to one of the original circuits. There thus were sixteen judicial districts. Each of the fifteen states constituted an entire district, except Massachusetts, whose detached territory, constituting a separate district, was not a division like any of the divisions of states into districts which were afterwards made.

Lest a doubt should arise whether, under this organization of the courts of the United States, their process might not, in certain cases, run beyond their jurisdiction, the act of 1789, provided, or as Judge Washington says, "declared," that no civil suit should be brought before either of the said courts against an inhabitant of the United States, by any original process in any other district than that in which he is an inhabitant, or in which he shall be found at the time of serving the writ. In the reported cases, the effect of this enactment has been considered with a sole reference to the constructive, or actual service of process beyond the limits of the state, as well as district, for which the court issuing it was held. These cases recognize, as independent of the enactment, the rule that a controversy is not cognizable by a tribunal which has jurisdiction of neither the thing nor the person against whom proceedings are directed. They regard the prohibition in the act as a measure of precautionary legislation to prevent a departure

from this rule in the procedure of the courts of the United States. Toland v. Sprague, 12 Pet. [37 U. S.] 300; Piquet v. Swan [Case No. 11,134]; Ex parte Graham [Id. 5,657]; Allen v. Blunt [Id. 215]; Day v. Newark Co. [Id. 3,685].

A suit in equity, in which the original process is a writ of subpœna to appear and answer, was, of course, included in this prohibition. In the introduction to Crompton's Practice, published three years before the act was passed, this writ, as used on the equity side of the English court of exchequer, in imitation of the course of proceeding in chancery, had been denominated "an original process in a civil action." It was perhaps the original process as to which the precaution of such an enactment was, most of all, necessary. As a process directed immediately to parties defendant, it differs from the original process in suits at law, which is directed to the marshal, sheriff, or other local officer by whom it is to be executed. In consequence of this difference from process ministerially directed, it was, at one time, supposed in England that service of a subpœna upon a defendant in Scotland, or even beyond the four seas, if personally made, would be sufficient. 2 Madd. Ch. Prac. (2d Ed.) p. 199. The opinion was apparently sustained by reported cases. But upon examination of the registrar's book, it was afterwards discovered that these cases had been misreported. A service of the subpœna made beyond the jurisdiction of the court which issues it, except in modes, and under circumstances in which it has, from time to time, been authorized by statutes, is now regarded in England either as an absolute nullity, or as an insufficient foundation for any process of contempt for non-appearance. 2 Sim. 544; 4 Paige, 429; 1 Moll. 244, 245; 1 Hogan, 79, 131; 6 El. & Bl. 824, 825. And see the reports of the last case in 2 Jur. (N. S.) 787, and 36 Eng. Law & Eq. 179. The same rule now applies as to service of the writ in Jersey, Guernsey, and the other Norman isles which are under British dominion, but in which English laws are not in force, and the jurisdiction of English courts is not exercisable. Fernandez v. Corbin, 2 Sim. 544. See 4 Inst. 286; 11 Exch. 64, 67, 68. A case reported as having occurred in the year 1781, shows, however, that at the date of the act of 1789, there was in England a contrariety of opinion upon the general subject. 2 Dick. 587.

While every state, except Massachusetts with reference to Maine, constituted still a single entire district, the act of 2d March, 1793, § 6 [1 Stat. 335], enacted that subpœnas for witness required to attend a court of the United States, in any district, may run into any other district, provided that, in civil causes, the witnesses do not live out of the district at a distance greater than one hundred miles from the place of holding the court. This, it is believed, is the only law

of the United States which, for any purpose whatever, authorizes any process issued on behalf of a private party to cross the line of a state. By an act of 9th June, 1794 [1 Stat. 395], "the state of North Carolina" was "divided into three districts, in which the district court of the said state" was to "be held at such times and places as" were "already ascertained by law" for the stated sessions of the court. The act defined the territorial extension of the respective districts. It created no new or distinct court. The judge, clerk, and marshal, a single officer of each denomination, retained respectively their former positions for the whole original district, of which the so called new districts were thus divisions. An act of 1797 [Id. 517] reunited them as a single district; but an act of 29th April, 1802, again divided the state into three such districts or divisions. The same act of 29th April, 1802 [2 Stat. 156], divided Tennessee which had, in the meantime, been admitted as a state, into two districts. The court of each district was to be held by the judge of the former district in whose office no change was made; but the districts were not the less distinctly organized with a different clerk, marshal, and attorney of the United States for each. The subsequent acts as to Tennessee prior to one of the year 1822 which will be particularly mentioned under a distinct head, require no citation. An act of 9th April, 1814 [3 Stat. 120], "for the more convenient transaction of business in the courts of the United States within the state of New York," divided that state into two districts. But there was no marshal in the state other than the former one officiating under his previous commission, until the 3d March, 1815 [Id. 235], when an act authorizing the appointment of a marshal for the Northern district impliedly limited the official character of the former incumbent and his successors to that of marshal for the Southern district. By an act of 20th April, 1818 [Id. 462], Pennsylvania was divided into an Eastern and Western district each separately organized, with a judge, district attorney, and marshal of its own; and by an act of 4th February, 1819 [Id. 478], Virginia was divided into two similar districts. These respective acts conferred upon the district court of the Western district of each of the two states, in addition to the ordinary jurisdiction and powers of a district court, the jurisdiction of all causes, except appeals and writs of error, cognizable by law in a circuit court, subject to writs of error in modes respectively provided. The law dividing Pennsylvania contained an enactment in the words: "All actions, suits, process, pleadings, and other proceedings of a civil nature, except in cases of appeals and writs of error, commenced and pending in the district or circuit court of said district of Pennsylvania, in which no verdict shall have passed, or

plea to the merits shall have been decided, and which, by law, should have been or commenced in said district court of said Western district, if the same had been had or commenced before the passing hereof, and where the parties shall not otherwise agree, shall be and hereby are continued over to the district court of the Western district established by this act, and shall there be proceeded in with like effect and in the same manner as if originally had or commenced therein."

No other state had been divided into districts when the supreme court, in February term, 1822, under the authority of the act of May, 1792, § 2 [1 Stat. 276], prescribed "rules of practice for the courts of equity of the United States.' A comparison of the acts which had thus divided five of the states, indicates that there had not been any uniform system of legislation on the subject. The general purpose of these acts, indeed their sole purpose, had been a convenient partition of the judicial business within the respective states. An extinction of any part of the former business of the courts was not intended. So far as it had occurred indirectly through the provisions of the acts, it was a result of defective legislation. The result, perhaps, may not have been produced at all in North Carolina, where one marshal still officiated for the whole state. However this may have been, the result in New York, Pennsylvania, and Virginia, was, that in suits at law, as the process could not be directed otherwise than to the marshal of the district in which it was issued, it could not be served in another district of the state. Where the jurisdiction existed, its exercise was thus prevented in cases in which the defendants, though citizens of the state, did not appear, and could not be served with process in the district. For such cases, a partial remedy of this evil was provided by the above mentioned act of 1839, and a complete remedy by an act of 4th May, 1858 [11 Stat. 272], which will be mentioned hereafter.

In the case of a subpoena to testify, the act of 1783 had been intended merely to sanction crossing the line of a state for the purpose of service of the writ upon a witness not living more than one hundred miles from the place of trial. After certain states had subsequently been divided into districts, the act, of course, authorized the service of it upon such a witness beyond the line of the district, but within the limits of the state in which it was issued, if a legislative authority for such a service of it was required. But in the case of a witness living within the state, more than one hundred miles from the place of holding the court, who has been served within the state, but out of the district, though service of the subpoena should be deemed regular, there cannot be an attachment if he disobeys his

mandate. Whether the service of the subpœna would be deemed regular or not is, therefore, a question of little, if any, practical importance, and one which, in practice, can scarcely arise.

But the case of a subpœna to appear and answer in an equity is, in this respect, different in the courts of the United States. The difference has existed since the adoption of the rules of 1822, if not from an earlier period. The effect of the prior legislation which has been mentioned, upon the case of defendants in a suit in equity, citizens of the same state, but not residing or found within the same district of the state, has been different from its effect in suits of law. The writ of subpœna to appear and answer in equity, as process directed, immediately to the defendants themselves, has already been distinguished from original process at law. The subpœna differs in like manner from the subsequent processes of contempt for not appearing in obedience to its mandate, or for not answering after appearance. These processes, of which the attachment is the first, are directed in England to the sheriff or other local officer. A marshal of the United States cannot execute one of these processes beyond his district. But it by no means followed that the process of subpœna, when issued by the circuit court for one of the districts of a state, could not, in any case, be served in another district of the same state. Until the promulgation by the supreme court of the rules of 1842, this process might have been served by any person. The rules of 1822 had not required that it should in any case be served by a marshal. The 8th of those rules merely required that it should be executed by a sworn officer, or that affidavit of the service of it when executed by any other person should be made. The 15th of the rules of 1842 is that "the service of all process, mesne and final, shall be by the marshal of the district, or his deputy, or by some other person specially appointed by the court for that purpose, and not otherwise. In the latter case, the person serving the process shall make affidavit thereof." The subpœna, when there is no special order of the court, is under this rule, in substance and effect, process directed to the marshal, but it is not in form directed to the marshal. Other process is directed to him, and cannot be directed, even by the court's order, to any other person, except in the case in which he or his deputy is a party, as provided by the act of 1789. The distinction between such other process and the subpœna to appear and answer is recognized in the rule of 1842, which does not limit the court's power to direct that the subpœna shall be served by another person to this case alone in which the marshal is a party. This power, under the rule, is exercisable, therefore, whenever its exercise may, in the opinion of the court, promote the ends of justice, conformably to the rules

prescribed by congress in organizing the courts and regulating their procedure.

We have seen that in England the service of such a subpœna out of the realm is not regarded as effectual, because the writ cannot run beyond the limits of the jurisdiction. But the process of subpœna always ran, throughout the realm, into its territorial divisions, in which ministerially directed processes of the courts of chancery, including the processes of contempt, could not be executed by any local officer to whom they might have been addressed. The subpœna was the former process to bring in a party to answer a charge before the king in council (see Hale, Jur. H. L. pp. 7, 44), and was, for some remedial purposes, a usual process of the court of chancery as early as the reign of Edward III., when the jurisdiction of the court was beginning to show traces of a partial independence of that of the council. See the records in 1 Rolle, Abr. 372. The present equitable jurisdiction of the court, if not that which was thus exercised at that period, originated in it; and the process was indubitably the same. If a question could have arisen as to the propriety, there could be none as to the power of sending this original process into any part of the realm. See 2 Burrows, 856. Chief Baron Gilbert (Forum Rom.) appears to have thought that the subpœna to appear and answer had been adopted from the common-law process to bring in a witness to testify. The subpœna to testify, like the subpœna to answer, cannot be served beyond the jurisdiction of the court which issues it. But it runs into every part of the territory which is within the court's jurisdiction. Thus, in Pennsylvania, when it issues from one of the courts to the respective counties, it runs into every county of the state. 2 Serg. & R. 349.

The distinction between the process which is directed to a local officer, and the process of subpœna directed to the party, has been exemplified in England in the case of a defendant residing in one of the counties palatine. The peculiar jurisdiction of the court of equity of the palatinate is exercisable only "between parties dwelling within the same, and for lands there, and for other local matters." Hales v. Daniel, Nels. Ch. 67, 68; 1 Cas. Ch. 41; Moor v. Somerset, Nels. Ch. 51. Thus defined, it is an exclusive jurisdiction. But if the suit is not of a local nature, or if any one party sued resides elsewhere, or if complete justice cannot, for any other cause, be rendered in that court, the court of chancery of England, or the court of exchequer on its equity side, has the jurisdiction. The legal presumption is always in favor of the jurisdiction of the superior court until a case has been shown, upon plea, to be exclusively cognizable, and sufficiently remediable, by the local court. A subpœna to appear and answer in an equity suit in chan-

cery, or in the exchequer, may, therefore, be served in the county palatine. Cheetham v. Crook, McClel. & Y. 307; Egerton v. Derby, 4 Inst. 213, 12 Coke, 114; Edgworth v. Davis, Nels. Ch. 66; Owen v. Holt, Hob. 77; Ld. Redes. Tr. (4th Ed.) 224, 225, and the cases there cited. But independently of the statute (27 Hen. VIII. c. 24, § 3) and some other acts of parliament, the court of chancery, if the defendant had not appeared, could not have issued an attachment or other process of contempt to be executed within the palatinate. That act provided that, after a day named in it, all process in every county palatine should be made in the name of the king by the person having the royalty, and should be tested in the name of such person. Under this enactment, the process could not regularly be issued out of the chancery in the name of the king, directed to the sheriff of the county palatine. The practice was to issue out of the chancery of England a writ in the name of the king, directed to the chief judicial officer [3] of the county palatine, requiring him, under the seal of the county, in the name of the king, to command the sheriff of the county to attach the defendant. See Lord Cholmondeley's Case, cited by Lord Kenyon in 6 Durn. & E. [6 Term. R.] 73. If the writ were addressed directly to the sheriff of the county palatine, it would, on motion, be quashed. Bradshaw v. Davis, 1 Chit. 374. And see Bracebridge v. Johnson, 1 Brod. & B. 12. The effect of British statutes of the present century has been to alter this practice as to the palatinates of Durham and Chester. But it was followed as to the duchy of Lancaster after their enactment. Lord Kenyon thought that so soon as the writ of attachment, properly tested, had been made out in the county palatine, and been delivered there to the sheriff, he became responsible directly to the court of chancery for his acts and omissions under it. The practice in the chancery, when obedience by the sheriff is to be enforced, is, however, to make an order upon the judicial officer of the palatinate to return the writ directed to him, and afterwards to make an order upon the sheriff of the county palatinate to return the second writ.

In England these distinctions between the process of subpœna and processes of contempt have been matters rather of form than of substance. Judgment that the bill be taken as confessed cannot there be entered until the defendant, after appearance, has been proceeded against as in contempt for not answering. Consequently, the question of the regularity of the place of service of the subpœna has usually arisen upon a

[3] The writ was directed to the Bishop of Durham, who alone of the proprietors of the palatinates, had an appellate judicial cognizance of suits in equity in their courts. It was directed to the chamberlain of Chester, and to the chancellor of the duchy of Lancaster.

subsequent application for an attachment, when it has, for practical purposes, been resolved into a question whether the attachment could be executed there. If it could not, the regularity of the service of the subpœna had usually been a point of no practical importance. But in the courts of the United States, a different practice, which had prevailed in some of the states before the judiciary act of 1789, and had been followed under it in some of the circuits, was established on a uniform footing for all of them by the rules of 1822. According to this practice, if the defendant did not appear and file his answer within a prescribed period after the proper day for his appearance, the complainant, at his option, instead of proceeding by attachment, might "proceed to take his bill for confessed," or he might have a general commission to take depositions, and proceed to a hearing, as if there had been an answer and replication. The rules of 1842, omitting the latter alternative require that, at the bottom of the subpœna, shall be placed a memorandum that the defendant is to enter his appearance on or before the return day, "otherwise the bill be taken pro confesso"; and provide for the entry of an order that it be so taken if he do not answer within a prescribed period. The judiciary act of 1789 would thus have given cognizance of the present case to this court; and the acts which have since divided the original district have neither taken the jurisdiction away, nor prevented its exercise. According to the practice recognized or established by the rules of 1822, and continued under those of 1842, if an equity suit was properly brought in any district against certain defendants, there could be no difficulty, doctrinal or practical, in the service of a subpœna upon other defendants, citizens of the same state, residing in another district of the state. Under the rules of 1822, this writ might have been served upon them by any person. Under the rules of 1842, there could be no difficulty in obtaining, in a proper case, a special appointment by the court of a person to make the service. After waiting the prescribed time to afford an opportunity for contestation by the party served, an order might, if he did not appear, be obtained, that the bill, as to him, should be taken as confessed. As no further decree, and no enforcement of any decree, would, as to S. B. Ludlow, be necessary in this cause, it might, after such an order, proceed against other parties without further impediment under this head. This, it has been said, would have been the practice in a case like the present, properly brought in the district in which the process was issued. In the present case, the question whether this was the proper district could have been attended with no difficulty. The principal, as well as the primary, cognizance of the cause was here.

But, in cases of a different character, the

question which district was the proper one for the cognizance of an equity suit against defendants, within the jurisdiction, but residing in different districts of the same state, must often have been attended with embarrassing difficulties. A simple rule would have been, that the filing of the bill in either district, and primary service of process within its limits upon any one defendant, should always vest the cognizance of the cause in the circuit court of such district. In an equity suit, however, the casual primary service upon a mere formal party, having an insignificant interest, or, perhaps, no interest whatever in his own right, might, under such a rule of practice, have taken away the right of adjudication from the court of the district in which the controversy would seem, in a particular case, to be principally cognizable. But the objection thus founded upon the contingent occasional occurrence of such a case was outweighed by considerations in favor of a rule of certain uniform applicability. Therefore, a series of particular statutes, beginning in the year 1822, determined, according to this rule, the practice of the circuit courts for the several districts of the respective states of Tennessee, Alabama, Mississippi, Georgia, Iowa, Ohio, and Texas. The last of these particular enactments was in 1857. The first of them had passed on 30th March, 1822. It enacted as to suits by citizens of the United States in the circuit courts of the United States for either the district of East, or of West, Tennessee, against two or more citizens of the state of Tennessee, some of whom should reside in East, and some in West, Tennessee; that the plaintiff might cause the clerk of the circuit court in which he should elect to commence his suit, to issue duplicate writs, one directed to the marshal of East, and the other to the marshal of West, Tennessee, which writs it should be the duty of the respective marshals to execute and return, and that, when returned, they should be docketed, and proceeded in to judgment as one case only. A provision authorizing executions to run from one district of the state into the other was added. An act of 18th January, 1839 [5 Stat. 321], divided the state into three districts, and re-enacted the above provisions of the act of 1822, confining, however, its provisions to suits not of a local nature, but omitting the restriction which had confined their application to cases in which citizens of the United States were plaintiffs. The form of the acts passed before 1839, as to Alabama and Mississippi, and after 1839 as to Georgia, Iowa, Ohio, and Texas, differed from the act as to Tennessee only in the degrees in which the language used in them, respectively, approximated that of a general act passed on 4th May, 1858 [11 Stat. 272], for the apparent purpose of regulating the practice, under this head. upon a uniform footing throughout the United States.

The general act of 4th May, 1858 [11 Stat. 272], is entitled "An act to provide for the issuing, service and return of original and final process in the circuit and district courts of the United States in certain cases." The first section enacts "that all suits not of a local nature hereafter to be brought in the circuit and district courts of the United States, in a district in any state containing more than one district, against a single defendant, shall be brought in the district in which the defendant resides; but if there be two or more defendants residing in different districts in the same state, the plaintiff may sue in either district, and issue a duplicate writ against the defendants directed to the marshal of any other district within the state in which any of the defendants reside, on which duplicate writ the clerk issuing the same shall endorse that it is a true copy of a writ sued out of the court of the proper district; and such original, and duplicate writs, so issued, shall, when executed, be proceeded on accordingly; and upon any judgment rendered in a suit so brought, process of execution may be issued and directed to the marshal of any district in the same state. And in suits of a local nature, where the defendant resides in a different district in the same state than the one in which the suit is brought, the plaintiff may have original and final process against such defendant directed to the marshal of the district in which he resides." The second section enacts "that in all cases of a local nature, at law, or in equity, where the land, or other subject matter of a fixed character, lies partly in one district, and partly in another district within the same state, the plaintiff may bring his action or suit in the circuit or district court of either district; and the court in which any such action or suit shall have been commenced, as aforesaid, shall have jurisdiction to hear and decide the same, and to cause mesne or final process to be issued and executed as fully as if the land or other subject matter were wholly within the district for which such court is constituted."

In suits which are within the enactments of this law, every case which can arise, in practice, under this head, appears to have been provided for. The provisions of the second section include, certainly, suits in equity, as well as actions at law. The provisions of the first section likewise apply to suits in equity, if the phrase "writ against the defendant directed to the marshal" includes the subpoena to appear and answer. Unless the phrase is interpreted so as to include this writ, the uniformity in the practice under the act throughout the United States which it appears to have been intended to secure, cannot be attained. This will be seen upon a recurrence to the above mentioned particular statutes as to Tennessee, in the first of which, passed, as above, in 1822, the legislation in question originated. These

acts were an adaption to the courts of the United States for Tennessee of a practice which appears to have been familiar in the courts of the state in suits in equity. 6 Yerg. 85. Such suits must, therefore, have been within the intended application of the above mentioned acts of 1822 and 1839, as to the districts of Tennessee. The words of these acts were not more applicable to suits of the kind than the words of the act of 1858. While Tennessee was a part of North Carolina, "an act for giving an equity jurisdiction to the superior courts" for the respective districts of that state, passed in 1782, had conferred upon them the jurisdiction previously exercised by the court of chancery under the British government. It enacted that, upon the filing of the bill, the clerk should "issue a writ of subpoena, as is usual in cases of chancery," or, upon a special order of a judge to hold the defendant to bail, should issue, for this purpose, a writ in a prescribed form, directed to the sheriff. "Upon such writ or subpoena being duly served, and a copy of the bill delivered in proper time, proof being made to the satisfaction of the court, by return of the sheriff, or by affidavit, the defendant" was to "appear, and put in his answer, or plea, agreeably to the practice in chancery, or demur, or, on failure thereof, the plaintiff's bill" was to "be taken pro confesso." The subpoena in equity seems to have been regarded, in some of the states, from a period prior to the judiciary act of 1789, and in some of the circuit courts of the United States, from a period long anterior to the adoption of the rules of 1842, as process directed, in the state courts, to the sheriff, and in the federal courts, to the marshal. A statute of New Jersey, passed on 13th June, 1799, enacted "that it shall be the duty of the sheriff, or coroner, as the case may require, of any county in this state to whom any subpoena, order, attachment, process of sequestration, writ of execution, or other process issuing out of the court of chancery shall be directed or delivered, to serve, or execute, the same, and to make return thereof at the time and place therein mentioned, which shall be filed by the clerk"; and "that every subpoena, or process for appearance shall be served on the person to whom it is directed, or a copy thereof left at his dwelling house, or usual place of abode, at least ten entire days prior to its return." In this act, the subpoena, though in form directed to the person to be served, is classed with process ministerially directed. From the case of Kennedy v. Brent, 6 Cranch [10 U. S.] 191, it may be inferred that in the circuit court of the United States for the Eastern district of Virginia,[4] the practice, adopted

4 The case occurred in that portion of the District of Columbia, which had been ceded by Virginia. The opinion of Marshall, Chief Justice, and the decision of Chancellor Wythe, cited in the argument, sustains the inference stated.

from that of the state, was in the year 1810, that the subpoena in equity might be served by any person, but that its delivery to the marshal to be executed imposed upon this officer a duty to serve it not less obligatory than if it had been formally directed to him. Its delivery to a sheriff in England imposed no such obligation upon the sheriff.

If the act of 1858 had been passed before the adoption of the rules of 1842, the writ of subpoena to appear and answer in equity could not, however, in this court, have been regarded as process directed to the marshal, in any sense in which the phrase could have been understood here. But even here, the process may, under these rules, be understood as one of this description. The rules having been promulgated under the authority of an act of congress, have, in some degree, the force of statutory regulations. They provide, as above, that the service of all process in equity, including the subpoena, shall be by the marshal of the district, or his deputy, or by some other person specially appointed by the court. Independently of the act of 1858, when an order for service by another person is not applied for, the process cannot, under the rules of 1842, be served otherwise than by the marshal of the district, or his deputy. In such a case the record of the proceedings may, with great propriety, recite the filing or exhibition of the bill, and, after setting it forth, state that process of subpoena was thereupon awarded and issued, to be served by the marshal of the district, or by his deputy. The writ also might, with equal propriety, be endorsed by the clerk, at the complainant's instance, that it was to be served by the marshal, or his deputy, according to the rules. See [Kennedy v. Brent] 6 Cranch [10 U. S.] 189. With or without such an endorsement, the subpoena, appearing by the record to have been thus awarded, is, as has already been suggested, in substance and effect, under the rules of 1842, process directed to the marshal. In the case of Allen v. Blunt [Case No. 215] Judge Nelson appears to have thought that, in the absence of everything like such an entry of record or endorsement, the subpoena could not be regarded as a process directed to the marshal. In that case the question was, whether service of a subpoena, in equity, upon the defendant, appeared by the marshal's return to have been made in the district of Massachusetts. The return did not state where it had been served. Judge Nelson, remarking that the fact of the service upon the defendant in the district of Massachusetts rested wholly upon the subpoena and return, said: "The writ of subpoena is not directed to the marshal for anything that appears in the record; and the return speaks of the service of a notice upon Blunt, which might very well refer to the memorandum accompanying the subpoena, directing that the appearance of the defendants must be entered on

or before the return day of the writ, or the bill would be taken pro confesso." These observations would seem to import that, though the subpœna is, in the body of it, directed to the defendant, and not to the marshal, yet the record of the proceeding under which it has been issued, and is to be served, may contain what renders it process directed to the marshal, by whom it is to be served, and whose return is to attest the service.

Under an act of 1858, a bill averring residence of the defendants in different districts of the state, might very properly pray that the process, in duplicate, should be awarded for execution by the respective marhals, according to the provisions of the act. The clerk, in making out the record, would then very properly set forth an award of process accordingly; and he might endorse the duplicates of the subpœna with a direction that service of it by each of the respective marshals be made upon the defendants residing in his district. Each duplicate would thus become process directed to the marshal of one of the districts. These formalities might, perhaps, all, or some of them, be dispensed with, leaving the act of 1858 and the rules of 1842 to define their own effect. The ascertainment of their effect is, however, facilitated by stating thus a case of the fullest compliance with such formalities. This act of 1858 may, therefore, be interpreted as applicable to a suit in equity. Had it been interpretable as a measure entirely of intended new legislation, and thus applicable to suits in equity, it would show that, in the opinion of congress, the subpœna ·in equity did not, in any case, run out of the district in which it was issued into another district of the same state. The circumstance that the act, in express terms, is limited in its application to suits brought after its enactment, would then have added force to this argument. In part, the purpose of the act was to remedy absolute defects in the previous legislation. Thus in certain states, including Pennsylvania, it restored, in suits at law, the exercise of the jurisdiction on a footing as extended as before any division of the respective states into districts; and rendered the practice in them the same as that already established, by particular acts, for Tennessee and certain other states. But its purpose was also to settle the practice under other heads, according to rules applicable alike in all parts of the United States. We have seen that although, before its enactment, the subpœna from a district in which a suit in equity was properly brought, might have run into another district in the same state, yet the question, in which of two districts of a state the cause was properly cognizable, might often have been involved in embarrassing uncertainty. Under the act, the residence of any one defendant in either district in which the bill may be filed suffices always to determine the question,

and sustain a service of process in the other district. The act thus furnishes, as to suits in equity, a uniform rule of proceeding, where the practice might otherwise have been uncertain and variable.

This law certainly contains enactments which are not new. Its first enactment that all suits not of a local nature, "in a district in any state containing more than one district, against a single defendant," should be brought in the district in which he resides, is clearly declaratory. It, moreover, attracts attention from the omission of any such provision, in express terms, for the case of a suit against a plural number of persons, all residing in the same district. The latter case, and the case expressly provided for, do not seem, either· of them, to have required statutory regulation. Again, a general act of congress, passed on 20th May, 1826 [4 Stat. 184], had enacted that all writs of execution upon any judgment or decree obtained in any of the district or circuit courts of the United States, in any state which had been, or might thereafter be, divided into two judicial districts, ·might run and be executed in any part of such state, but ·should be issued from and made returnable to the court where the judgment was obtained. Notwithstanding this general enactment, the act of 1858 has re-enacted its provisions. They had in like manner been unnecessarily re-enacted for Tennessee in 1839. · Their original enactment for Tennessee in 1822 had, however, been a useful provision for that state, at that period. This repetition in the act of 1858 of the general enactment of 1826 as to executions, the general conformity of the provisions of the act of 1858 concerning original process to those of the prior particular laws which have been mentioned, and the mode above defined, in which the act of 1858 applies to ·suits in equity, show that this act was not intended as an entirely new measure of legislation. Therefore the argument that the act, if applicable at all to suits in equity, manifests an opinion of congress that the subpœna could not, before the act, have been served, in any case, in another district of the same state, cannot prevail.

To recapitulate: The act of 24th September, 1789 [1 Stat. 73], divided the United States into judicial districts, with a sole reference to the jurisdiction of the respective courts, which it created. Process directed to a marshal could not be served beyond the limits of his district. He could not have crossed its line in serving the process, if nothing on the subject had been contained in the act. But the subpœna to appear and answer in equity was not in form, or in effect, process directed to the marshal. At the date of the act, opposing opinions were entertained upon the question whether in England such a writ could be served beyond the limits of the jurisdiction. That no doubt upon this or any similar question might be

entertained in the practice under this act, the 11th section provided that no civil suit shall be brought against an inhabitant of the United States, by any original process, in any other district than that of which he is an inhabitant, or in which he shall be found at the time of serving the writ. This enactment was applicable not less to the subpœna than to ministerially directed process. But its only effect, at its date, was to prevent the boundary of a state from being crossed in the service of original process of either kind. Under this act the former defendant, and S. B. Ludlow, could have been served with process, at law or in equity, in the same suit. The intended effect of the act which afterwards divided the state into two districts was a mere partition of the jurisdiction conferred by the act of 1789 between the courts of the two intraterritorial divisions. That these two acts, in their combined effect, prevented, in any case, the exercise of this jurisdiction where it had before been exercisable, was the result of an oversight in legislation since remedied. Where it occurred, it was not a direct consequence either of the prohibition in the eleventh section of the act of 1789, or of any enactment in the law dividing the state. It occurred in suits at law, when compulsory process was required against necessary parties residing in different districts of the same state, because the process in such suits could be directed to the marshal only. But when a suit in equity was brought against such parties, the subpœna, being directed immediately to themselves, could be served upon them all. The act of 1789 fulfilled its office in rendering service out of the district ineffectual, when, in order to make the service, the boundary of the state or original district was crossed. The rules of 1822, and the previous practice in some, if not in all, parts of the United States, dispensing with processes of contempt, enable the complainant, without issuing any writ ministerially directed, to obtain, as to such defendants as did not appear, an order that the bill should be taken as confessed. It was questionable whether a complainant could, under this practice, have claimed an arbitrary option to proceed in either district of the state, without reference to the question in which district his cause was the more properly cognizable. Particular acts of congress, however, gave him this option in certain states, in suits both at law and in equity. The rules of 1842 gave to the courts in Pennsylvania, and other states to which no such acts applied, a control in this respect of the proceeding, by preventing the service of process in equity otherwise than by the marshal of the district, unless a special order was made authorizing the service by another person. When there was no such order of the court, the subpœna became, under these rules, in substance and effect, process directed to the marshal of the district. But this character of the writ could,

in a case like the present, have been changed under these rules, by an order of the court appointing another person to make the service upon a defendant residing in the other district. The act of 1858, containing general provisions like those of the particular statutes already mentioned, gave to the plaintiff in every suit not local, against parties residing in different districts of the state, an election of the district in which to proceed; and thus rendered the practice on the subject uniform throughout the United States. The subpœna issued in duplicate under this act is, in effect, a writ directed to the respective marshals of the two districts, to be served by each upon such defendants named in it as reside in his district.

In suits in equity the average number of original parties is very much greater than in suits at law, and the necessity for adding other parties often develops itself as the suits proceed. This act must, therefore, have been intended to apply to suits in equity, unless the remedial purposes of its provisions had already been attainable in such suits under the former practice established by rules of the supreme court. If the act were inapplicable to such suits, the complainants might, therefore, with even more certainty as to the correctness of the practice, proceed in this case, under an appointment of a person other than the marshal of this district, to serve the process upon a new defendant in the Western district.

Had the decision been that a subpœna issued by this court, in equity, could not, independently of the enabling provisions of this act of 4th May, 1858 [11 Stat. 272], have been served in the Western district, the present case would be embraced within these provisions of the act. It is true that the act applies only to suits brought after it was passed. But the complainants can proceed properly, for the purpose in question, in one way only. This, as we have seen, is by an original bill in the nature of a supplemental bill, which would be, as to the former defendants, a supplemental, but, as to S. B. Ludlow, an entirely original, bill. The reason and spirit of the act of 1858 cannot require the complainants to go through the absurd formality of obtaining an order for the dismissal, without prejudice, of their original bill, as against the former defendants, for the mere purpose of bringing the case within the literal application of the words of the act, by recommencing the proceeding against those parties. By so doing, they could certainly bring themselves within the letter of the act. But it is to S. B. Ludlow unimportant whether he is made an additional party under such a proceeding, or in the other mode. The proceeding would not, as to him, be less original, in the one case, than in the other. So far as the proceeding is against "two or more defendants residing in different districts in the same state," the suit would, for the first time, be

brought, when the original bill in the nature of a supplemental bill, might be filed. The case is, therefore, perhaps, within the words, but certainly within the reason and meaning, of the law.

The result appears to be that, under an original bill in the nature of a supplemental bill, against the former defendants and S. B. Ludlow, service of a duplicate writ of subpœna could be made upon S. B. Ludlow, in the Western district, either under the act of 1858, or independently of its provisions.